Solar Electric Company, Appellant, *v.* Pennsylvania Public Utility Commission et al.
Stewart et al., Appellants, *v.* Same.

Argued April 25, 1939.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*David I. McCahill*, with him *Raymond E. Brown* and

*Edward F. Huber,* for Electric Company, appellant (No. 179), intervening appellee (No. 183).

*Samuel Graff Miller,* with him *Herbert S. Levy* and *Harry M. Showalter,* for Public Utility Commission, appellee.

*Lavelle A. Wilson* and *W. N. Conrad,* for complainants, intervening appellees (No. 179), appellants (No. 183).

PER CURIAM, November 15, 1939:

The magnitude of the record in these appeals—nearly ten thousand printed pages—is out of all proportion to the size of the utility involved or the field of its operations; and those responsible for its unnecessary expansion should be visited with a share of its cost. Where, as in the Scranton-Spring Brook Water Company cases (105 Pa. Superior Ct. 203, 160 A. 230, and 119 Pa. Superior Ct. 117, 181 A. 77) the territory involved covered a large section of two counties, embracing two large cities and many other good sized cities and boroughs, and the valuation of the water system amounted to scores of millions of dollars, there might be some reason for a record of this size, but an electric light plant in a borough of less than 5000 inhabitants, and with fewer than 1700 customers, valued at from $100,000 to $250,000, furnishes no excuse for it.

This is a rate case. It was complicated, and to some extent delayed, by proceedings for the acquisition of the plant, (1) by a larger company[1] and (2) by the borough of Brookville.[2]   It began on August 13, 1929,

---

[1] *Penn Public Service Corp. v. P. S. C.,* 88 Pa. Superior Ct. 369; *Borough of Brookville v. P. S. C.,* 102 Pa. Superior Ct. 503, 157 A. 513, affirmed 307 Pa. 194, 160 A. 856.

[2] *Solar Electric Co. v. P. S. C.,* 88 Pa. Superior Ct. 495; *Solar Electric Co.'s Appeal,* 290 Pa. 156, 138 A. 845, and 290 Pa. 372, 138 A. 914; *Solar Electric Co. v. Brookville Boro.,* 300 Pa. 21, 150 A. 92.

with the filing of a complaint by J. B. Stewart et al. alleging that the rates charged by Solar Electric Company, hereinafter called Solar, or respondent, were excessive and unreasonable, and praying for the reduction of the company's rates so as to return not more than *seven* per cent upon the fair and reasonable value for rate making purposes of its property used for the convenience of the public. This was entered to Complaint Docket, No. 8126. At the time this complaint was filed there was pending before the commission an application for the sale of all the property and franchises of Solar to Penn Public Service Corporation, or its successor, Pennsylvania Electric Company, hereinafter called Pennsylvania Electric. Some time later the Borough of Brookville was permitted to intervene as a party complainant. As the complaint affected rates that had been in force without objection for a long period of time the burden was on the complainants to sustain their complaint. An answer was duly filed by Solar, but a hearing of the matter was delayed pending a decision of the question whether the commission should act upon the application for approval of the sale of all the property and franchises of Solar to Pennsylvania Electric before hearing the complaint. This court decided in 102 Pa. Superior Ct. 503, 157 A. 513, (affirmed 307 Pa. 194, 160 A. 856), that the *fair value of the property* should be determined and the rate case be disposed of before passing on the approval of the sale.

Accordingly hearings on the rate case were begun on September 30, 1931. An inventory and appraisal made by the J. N. Chester Engineers, as of August 31, 1931, was introduced by the complainants. Two separate appraisals showing the reproduction cost, (1) new and (2) depreciated, of respondent's property were introduced by the respondent, one made by E. D. Dreyfus and the other by Maurice R. Scharff, both qualified engineers, based on an inventory made by Mr. Dreyfus and checked by Mr. Scharff. The Chester inventory

differed in material respects from that used by Dreyfus and Scharff and omitted some essential items of property contained in the latter. The engineer who testified for the complainants in support of the Chester Engineers' appraisal was Daniel E. Davis, so in referring to that appraisal we shall distinguish it as the Davis appraisal or valuation.

Under date of April 14, 1936, the commission entered an interim order requiring the parties to bring down their inventories and appraisals, submitted as of August 31, 1931, to December 31, 1935. These were submitted at hearings held on August 18 and 19, 1936.

On June 1, 1937 the Public Service Company Law was superseded by the Public Utility Law, approved May 28, 1937, P. L. 1053. On June 8, 1937, the Public Utility Commission, of its own motion, instituted an inquiry and investigation of Solar's rates, to Complaint Docket, No. 11404, which was, later, on motion of the attorney for the commission consolidated with the prior complaint, No. 8126. Section 312 of the Public Utility Law provides that in any proceeding upon the motion of the commission, involving any proposed or existing rate of any public utility, the burden of proof to show the rate involved is just and reasonable shall be upon the public utility. We are of opinion that this change in the law applied to the consolidated complaint in these cases.

At the same time, the new commission directed the complainants and respondent to bring down the data, relating to the inventories and appraisals of respondent's property, from December 31, 1935 to June 1, 1937. This was done by respondent and placed in the record at a hearing held on June 30, 1937. The inventory and appraisal furnished by *complainants* was not *brought down* to June 1, 1937, but was *trended* to a date as of May 31, 1937 and placed in the record at a hearing held on October 29, 1937. This did not include addi-

tions to the inventory since August 31, 1931, of the net value of $11,825.

Before the taking of testimony was concluded, the commission, under date of October 5, 1937, acting under the authority given it in section 310 of the Public Utility Law, fixed a tentative fair value of respondent's property at $200,000, and entered the following order: "It is ordered: That temporary rates be and the same are hereby imposed under section 310 of the Public Utility Law and that Solar Electric Company, respondent, file with the Commission on or before October 15, 1937, a new tariff, to become effective upon one day's notice, which shall effect a reduction in its gross operating revenues of not less than $11,300 per annum."

A review of the interim report, which is found in the Record, Vol. 1, pp. 33a to 51a, shows a careful consideration by the commission of the evidence then in the record, including not only the book value assigned to fixed capital, as disclosed by the books of the company, but also the reproduction cost of the property and the accrued depreciation, and this brought it within the constitutional requirements necessary for such a temporary rate order, as laid down by Mr. Justice REED, speaking for the Supreme Court of the United States, in *Driscoll et al. v. Edison Light & Power Co.*, 307 U. S. 104, 59 Sup. Ct. Reporter 715, filed April 17, 1939, which we shall refer to, at more length, further on.

Testimony before the commission was concluded on October 29, 1937. On July 5, 1938 the commission filed its report and order nisi. In this report, the commission wholly disregarded the evidence as to reproduction cost new of the utility's property used and useful in the public service, less depreciation, although, by its order and the order of its predecessor, the utility had twice been required to bring down its estimates and appraisals of such reproduction cost and depreciation, first, from August 31, 1931 to December 31, 1935, and second, to June 1, 1937; and also irrespective of the fact

that, in entering its interim order of October 5, 1937, the commission had used and relied upon, to some extent, the estimates and appraisals of reproduction cost thus brought down to present values; and, instead, it stated that, "It is the opinion of the Commission that the original cost of existing property, prudently invested, used and useful in utility enterprise, without any deduction for accrued depreciation, represents the money which has been invested and should, therefore, constitute a proper rate base" (111a). This it fixed at $143,765.57 and, with an allowance of $8836 for working capital and supplies on hand, it fixed the rate base at $152,601.57 (113a-114a) on which it allowed an annual return of 6%, or $9156. It also determined that the total annual net revenue to which Solar was entitled was $72,535, made up of $9156 aforesaid, plus operating expenses $54,539, annual depreciation, $2297, and taxes, $6543. It found that the operating revenue for the year 1936 and five months ended May 31, 1937 was $139,655.71 or $8215.04 per month; that on this basis the operating revenue for a twelve month period would be $98,580, which exceeded the allowable net revenue of $72,535, by $26,045, and it directed the respondent, Solar, further to modify its rates by an annual reduction of $14,745 in addition to the reduction of $11,300 provided for in its interim order of October 5, 1937 fixing temporary rates, and ordered it to file, post and publish a new tariff covering rates for electric service consisting of a *"single schedule* of block meter rates, applicable to all classes of customers, except street lighting"—instead of the company's division into domestic, commercial and power schedules—which was designed to produce the allowable annual net revenue of $72,535. Exceptions to this order were filed by both the respondent and the complainants. Except for slight modifications, not necessary to be recited, these were dismissed on November 1, 1938 and a final order as

above set forth entered. Appeals were filed by both respondent and complainants.

## FAIR VALUE

A careful reading of the commission's order of July 5, 1938 fails to disclose to us any finding or determination by the commission that the rate base fixed by it, inclusive of working capital, $8836, at $152,601.57 was the *fair value* of the respondent utility's property, used and useful in the public service; and, in view of the use of the term 'fair value' in the order of October 5, 1937 and its definite exclusion from the order of July 5, 1938, we deem this omission not an oversight, but an attempt on the part of the commission to avoid the rulings of the courts that the *fair value* used as the rate base must be the *present fair value*, that is, the fair value at approximately the time of the determination. As stated by the present Chief Justice in *Shirk v. Lancaster City*, 313 Pa. 158, 171, 169 A. 557, where the rates charged for water by a municipality were under consideration, "If this were a private water company and a sum sufficient had been found to cover operating expenses and contingencies, there would be allowed in addition a fair return on the *present value* of the property" (italics supplied). See also *San Diego Land and Town Co. v. National City*, 174 U. S. 739, 757, where the equivalent expression is used, "the reasonable value of the property *at the time it is being used for the public;* and *Los Angeles Gas & Electric Corp. v. R. R. Commission*, 289 U. S. 287, 305-308, where the latter expression is used interchangeably with "present value"; and cases of the United States Supreme Court cited in *Bangor Water Co. v. P. S. C.*, 82 Pa. Superior Ct. 48, on page 55.

Fair value is the thing which this commission and its predecessor were authorized by the legislature to ascertain. By Section 20 of Art. V of "The Public Service Company Law" of July 26, 1913, P. L. 1374, 66 PS Sec. 683, which was in force when the complaint in this

proceeding was filed, the public service commission was given power "to ascertain and determine the fair value of the property of every public service company," whenever it deemed "such valuation or determination" necessary or proper. That section also specifically enumerated certain matters to be considered by the commission "in ascertaining and determining such fair value", and to be "given such weight by the commission as may be just and right in each case", among which was "the reproduction costs of the property, based upon the fair average price of materials, property and labor." This section of the statute of 1913 was supplied by Section 311 of Art. III of the new "Public Utility Law" of May 28, 1937, P. L. 1053, 66 PS sec. 1151. Under it, fair value is still the thing the commission is authorized to ascertain and fix. The applicable provision of the new statute reads:

"The commission may, after reasonable notice and hearing, ascertain and fix the *fair value* of the whole or any part of the property of any public utility, in so far as the same is material to the exercise of the jurisdiction of the commission, and may make revaluations from time to time and ascertain the fair value of all new construction, extensions, and additions to the property of any public utility." (Italics supplied) While the new act (Public Utility Law) does not go into details as to the items which should be considered by the commission in fixing the fair value of a utility's property, as fully as the old act (Public Service Company Law) did, this was not because of any intention to change the law in this respect, but because the decisions of the United States Supreme Court and of our Supreme Court had definitely settled the principles to be applied by the commission in arriving at such fair value, and they did not require elaboration in the statute.

As before stated, three reproduction cost estimates, new and depreciated, were received in evidence during the hearings in this case and used by the present com-

mission "to demonstrate the basis of [its] determination of [its] tentative calculation of the fair value of the property of respondent" for the purpose of prescribing *temporary* rates, effective October 15, 1937 (39a). However, in its final report of July 5, 1938, the commission described these estimates as "unsatisfactory, conjectural and without probative value." (96a).

In the course of that report (107a) the commission expresses its opinion that its predecessor, and incidentally the courts, had failed "to perceive the problem [presumably, of determining the fair value of a utility's property for rate-making purposes and fixing just and reasonable rates] from the investors' and rate payers' standpoint." It then gives expression to its intention to determine "the rate base ...... in a manner somewhat different from that reflected in the orders issued in the past." In this connection the commission said:

"Heretofore the rate base has been determined generally by the commission on a basis of reproduction cost new less accrued depreciation. This formula produced a result arrived at entirely through approximations and theoretical calculations and, when determined, had no lasting usefulness, because of fluctuations in material and labor costs from year to year.

"The cost of reproduction as a determining factor in value had, it is true, been approved by a number of decisions, *Smyth v. Ames,* 169 U. S. 466, and a long line of cases following. In each of these cases, however, the court has carefully pointed out that it is one of the many factors that may be considered in arriving at a proper rate base. The cost of reproduction is a calculation designed to produce a figure equal to the cost of replacing the existing property new. There are several reasons why the premise on this theory does not meet the purpose for which it was formulated."

Then follows a statement by the commission of a number of alleged justifications for its determination to ignore established legal principles by abandoning

the beaten track of the federal and state decisions, blazing a new trail and setting up in this case its conception of the proper method of ascertaining and determining the basic figure upon which to calculate the return the owners of a utility are entitled to receive for furnishing service to the public.

## PHYSICAL PROPERTY

On December 24, 1929 the Public Service Commission directed respondent to furnish the complainants with an inventory of its property, which was promptly done. This inventory was the basis of respondent's reproduction cost estimates, but it was not used by Mr. Davis: he used a different one, made largely by two assistants, Francis A. Johnson and Fred D. Sayer, neither of whom, counsel for the commission say (brief p. 34), "had had previous experience in evaluating the property of an electric utility (Record pp. 435a and 387a), and the methods employed by these men in counting and estimating the various units of property such as poles and fixtures, conductors, transformers and similar items were so slipshod and inaccurate as to give rise to a very substantial doubt as to their accuracy, (Record 571a et seq.)." These three estimates were placed in evidence during the early hearings of the case and were all made as of August 31, 1931.

In its order of June 8, 1937, the Public Utility Commission directed that "Using the estimates of reproduction cost new and depreciated, now of record, both principal parties ...... submit [on June 30, 1937] revised estimates thereof, in the same form, [1] trended from the date of the original appraisal, August 31, 1931 to June 1, 1937, ...... [2] trended from the date of the revised appraisal, December 31, 1935 to June 1, 1937, with consequent adjustments of overhead allowances."

It was in obedience to these directions that respondent submitted its revised estimates of reproduction cost, new and depreciated, trended to June 1, 1937, in-

cluding net additions to its property. The trend factors were agreed upon at an engineering conference with the engineers of the commission. The estimates of its witnesses, Dreyfus and Scharff, as to Physical Property of the respondent, follow:

Reproduction Cost Estimate of Physical Property by Edwin D. Dreyfus, (Exhibit R-10, (N. S.) Vol. XXI, p. 8965a).

| Account No. | Item | New | Depreciated |
|---|---|---|---|
| 227 | Land | $800.00 | $800.00 |
| 229 | Power Plant Structures | 14,241.00 | 10,681.00 |
| ⎰ 232 | Gas Engines | | |
| ⎱ 233 | Electric Generators | 63,044.00 | 40,348.00 |
| 234 | Other Electric Equipment | 8,950.00 | 7,608.00 |
| 236 | Other Power Plant Equipment | 1,152.00 | 691.00 |
| 254 | Rights of Way | 116.00 | 116.00 |
| 256 | Poles and Fixtures | 41,274.00 | 31,781.00 |
| 257 | Overhead Conductors | 38,592.00 | 36,662.00 |
| 258 | Overhead Transformers | 21,566.00 | 18,547.00 |
| ⎰ 259 | Overhead Trans. Install. | | |
| ⎱ 260 | Overhead Services | 13,482.00 | 12,808.00 |
| ⎰ 266 | Meters | | |
| ⎱ 267 | Meter Installations | 21,607.00 | 17,286.00 |
| 273 | Municipal St. Incan. System | 11,264.00 | 7,322.00 |
| 279 | Other General Structures | 244.00 | 0 |
| 280 | General Office Equipment | 3,493.00 | 2,550.00 |
| 281 | General Stores Equipment | 913.00 | 712.00 |
| 284 | General Garage Equipment | 720.00 | 0 |
| 285 | General Laboratory Equip. | 282.00 | 211.00 |
| 286 | General Tools & Implements | 641.00 | 480.00 |
| | | $242,381.00 | $188,603.00 |
| | Accrued depreciation | $53,778.00 | |

Reproduction Cost Estimate of Physical Property by Maurice R. Scharff, (Exhibit R-4, (N. S.) Vol. XXI, p. 8953a).

| Account No. | Item | New | Depreciated |
|---|---|---|---|
| 227 | Land | $800.00 | $800.00 |
| ⎰ 229 | Power Plant Structures | | |
| ⎱ 279 | Other General Structures | 13,237.00 | 9,266.00 |
| ⎰ 232 | Gas Engines | 60,870.00 | 42,609.00 |
| ⎱ 233 | Electric Generators | | |
| 234 | Other Electric Equipment | 8,925.00 | 5,355.00 |
| 236 | Other Power Plant Equip. | 1,141.00 | 742.00 |
| 254 | Rights-of-way | 116.00 | 116.00 |
| 256 | Poles and Fixtures | 38,913.00 | 29,185.00 |
| 257 | Overhead Conductors | 35,504.00 | 31,954.00 |
| ⎰ 258 | Overhead Transformers | | |
| ⎱ 259 | Overhead Trans. Install. | 21,377.00 | 18,170.00 |
| 260 | Overhead Services | 14,024.00 | 11,219.00 |

| Account No. | Item | New | Depreciated |
|---|---|---|---|
| ∫ 266 | Meters | | |
| ∤ 267 | Meter Installations ....................... | 21,123.00 | 17,955.00 |
| 273 | Municipal St. Incan. System ............. | 10,344.00 | 7,241.00 |
| ∫ 280 | General Office Equipment | | |
| ∤ 281 | General Store Equipment ............... | 4,405.00 | 2,775.00 |
| 284 | General Garage Equipment .............. | 720.00 | 0 |
| 285 | General Laboratory Equip. ............... | 282.00 | 197.00 |
| 286 | General Tools & Implements ............. | 392.00 | 274.00 |
| | | $232,173.00 | $177,858.00 |
| | Accrued Depreciation .................... | $54,315.00 | |

The reproduction cost estimate of Daniel E. Davis, put in evidence by the complainants, is not made up under the twenty-one account number items and titles used by the engineers for respondent, but for present purposes we may use complainants' Exhibit No. 1, (1937 Series) Vol. XIII, p. 6005a, trended from August 31, 1931 to June 1, 1937.

It does not include additions to the plant since August 31, 1931, amounting to $11,825.

| Item | Reproduction Cost New | Accrued Depreciation | Cost New Depreciated |
|---|---|---|---|
| Power Plant and Equipment ...... | $73,009.00 | $66,823.00 | $6,186.00 |
| Distribution System ............... | 116,710.00 | 47,270.00 | 69,440.00 |
| | $189,719.00 | $114,093.00 | $75,626.00 |

The details of the above figures under the item "Power Plant and Equipment" are as follows:

| | New (1937) | Accrued Depreciation | Cost New Depreciated |
|---|---|---|---|
| Power Plant and Equipment | | | |
| Power House and Building .... | $8,081.00 | $4,670.00 | $3,411.00 |
| Retaining Wall ................. | 1,442.00 | 1,317.00 | 125.00 |
| Power Equipment | | | |
| 90 HP Bruce MacBeth ........ | 8,231.00 | 7,931.00 | 300.00* |
| 150 HP American-Crossly ...... | 11,320.00 | 10,820.00 | 500.00* |
| 250 HP Turner-Fricke ......... | 14,976.00 | 14,376.00 | 600.00* |
| 250 HP Bruce-MacBeth ........ | 16,432.00 | 15,682.00 | 750.00* |
| Switchboards, etc. ................ | 7,930.00 | 7,730.00 | 200.00* |
| Water Supply & Cooling Tower .. | 3,649.00 | 3,549.00 | 100.00* |
| Misc. Power Plant Equip. ........ | 948.00 | 748.00 | 200.00* |
| | 73,009.00 | 66,823.00 | 6,186.00 |

* Salvage value only, due to fact that duplicate transmission lines, serving Borough, render generating plant unnecessary.

It is apparent from an inspection of the Dreyfus and Scharff appraisals of the physical property of respondent that the differences in the results reached by them

are not sufficient to justify a detailed analysis of the items in which they occur. It will be more profitable to compare the estimate of complainants' engineer, Davis, with the Dreyfus appraisal.

The controversy between the parties upon the question whether the "gas generating station" of appellant is used or useful in rendering service to the public, is sharply reflected in the Dreyfus and Davis appraisals. From the inception of the service down to September 17, 1928, appellant generated all its current at its own plant, but on that date entered into a contract to purchase its requirements from Pennsylvania Electric Company. In ascertaining "the book cost of fixed capital" as of May 31, 1937, the commission remarked:

"The commission concludes from the record in this case that the gas engine generating plant is not used or useful as an emergency, stand-by or reserve plant and we, therefore, exclude the gas engines, generators, and auxiliary equipment as being property not used or useful in the public service."

In this connection the commission made a tabulation (71a) of the book cost of the gas power generating plant as of May 31, 1937, under account numbers and titles comparable with the numbers and titles in the reproduction estimates. The following is a comparison of the commission's book cost estimate with the Dreyfus depreciated reproduction cost appraisal:

| Account No. | Commission Account Title | Commission Amount | Dreyfus Amount |
|---|---|---|---|
| 227 | Land | $1,000.00 | $800.00 |
| 229 | Power Plant Structures | 3,500.00 | 10,681.00 |
| 232 | Gas Engines | 36,153.97 | .......... |
| 233 | Electric Generators | 13,823.18 | 40,348.00 |
| 234 | Other Electric Equip. | 5,361.58 | 7,608.00 |
| 236 | Other Power Plant Equip. | 209.50 | 691.00 |
| | | $60,048.23 | $60,128.00 |

Pursuant to its above quoted finding the commission in its determination of a rate base "allowed the full cost of land and building to remain in fixed capital,"

(74a) but "excluded the last four items noted above in the amount of $55,548.23."

A comparison of reproduction cost new estimates of Davis and Dreyfus of the items here involved may be thus stated:

|  | Davis | Dreyfus |
|---|---|---|
| Land and Building | 9,523.00 | 15,041.00 |
| Equipment | 63,486.00 | 73,146.00 |
|  | 73,009.00 | 88,187.00 |

These tabulations indicate that it makes little practical difference whether the book cost or the depreciated reproduction cost basis be adopted in disposing of the controversy relative to the power plant. The commission excludes all the equipment, valued by it at $55,548, and Davis allows only a junk value of $2650 out of his appraisement of $63,486, or an elimination of $60,836.

The reason assigned by Davis for including only the salvage value of the equipment was set forth in the above quoted note to his estimate, "Salvage value only, due to fact that duplicate transmission lines, serving Borough, render generating plant unnecessary."

There is competent engineering testimony upon the record to the contrary. P. J. Morrissey testified (p. 4474a): "The transmission was adequate as a stand-by with the gas engine plant. The gas engine plant was a stand-by on the transmission line, whichever one could be used as the prime source of power."

Scharff testified (p. 3601a): "In my opinion, the company not only should not be required to remove its plant, *but should not be permitted to remove it,* if it wished to do so, until the supply to Brookville is made to correspond with modern plants, applicable to a community of this importance, which would require an additional transmission line,[3] from a separate source of

---

[3] Speaking of this pole line, we said in *Penn P. S. Corp. v.*

power there, in addition to this 6700 volt sub-station or the generating station, such transmission line to run through its entire length onto the pole line independent of the other line supplying the town, and also until the sub-station at Brookville is provided with at least one spare transformer; and until those conditions are realized, representing the minimum requirement for dependable supply on transmission lines into a community of the size of Brookville, the company should be required to maintain its generating equipment in readiness for service to meet the requirements in case of an interruption, due either to the Timblin sub-station going out of service or the present transmission lines going out of service, or the Brookville sub-station going out of service, or a single transformer in Brookville sub-station going out of service."

Upon an examination of the testimony we are of opinion that the equipment of the power plant should not be included in an estimate of reproduction cost at the figures appearing in the estimates of Messrs. Dreyfus and Scharff, but we are also of opinion that the portion of the order which totally excludes that equipment lacks evidence to support it. The plant, including the equipment, should be included in any estimate of reproduction cost at a figure representative of its value as an emergency, stand-by or reserve plant. Although not a part of the record at the time the testimony was closed, there is attached to and made a part of respondent's exceptions to the order nisi the affidavits of W. C. Sontum, superintendent of Pennsylvania Electric Company, and W. J. Utts, vice-president of respondent, to the effect that the plant was actually used on April 6, 7, 8 and 9, 1938, when the transmission

P. S. C., 88 Pa. Superior Ct. 369, 371: "Moreover, the plan made necessary the erection of a power line about 22 miles long from the nearest point in the Penn Public Service Corporation's system. This it was estimated would cost $88,000, and there were estimated additional costs amounting to about $6000."

lines referred to by Davis and in the testimony were put out of service by a severe sleet storm, rendering it necessary to put respondent's power plant in service on April 8 and 9 for more than twelve hours on each day, during which it carried respondent's peak load consisting of 400 K.W.

Our conclusion is that the equipment should be included at fifty per centum of its depreciated reproduction cost as estimated by Messrs. Dreyfus and Scharff. This means that the Dreyfus total estimate of $188,603 must be reduced by one half of $48,647 (equipment items) or $24,324, making a net of $164,279. In the same way the Scharff total estimate of $177,858, must be reduced by one half of $48,706, making a net of $153,505.

If in lieu of the salvage value of $2650, stated by Davis there be substituted a similar estimate of $24,000 for the equipment, his estimate of depreciated reproduction cost of physical property would be approximately $97,000 plus $11,825, or $108,825.

We are of opinion that the order here appealed from, based, as it is, solely upon the commission's finding of the "original cost of fixed capital installed at May 31, 1937" and without giving any consideration whatever to the "reproduction cost" of the property as one of the factors to be taken into account in ascertaining its present "fair value", constitutes an "error of law" as that phrase is used in Section 1107 of Art. XI of the Statute of 1937, 66 PS sec. 1437, particularly where the appellant alleges confiscation.

From *Smyth v. Ames,* 169 U. S. 466, down to and including *R. R. Commission of California v. Pacific Gas and Electric Co.,* 302 U. S. 388, and throughout the decisions of our Supreme Court and of this court, the cost of reproducing the property has consistently been held to be not only a relevant but also an essential element in the ascertainment of its "fair value" for rate-making purposes.

In *St. Louis & O'Fallon Ry. Co. et al. v. United States et al.*, 279 U. S. 461, Mr. Justice McREYNOLDS stated (page 484):

" 'The elements of value recognized by the law of the land for rate-making purposes' have been pointed out many times by this court. *Smyth v. Ames*, 169 U. S. 466; *Wilcox v. Consolidated Gas Co.*, 212 U. S. 19; *Minnesota Rate Cases*, 230 U. S. 352; *Southwestern Bell Telephone Co. v. Public Service Commission*, 262 U. S. 276.; *Bluefield Water Works & Improvement Co. v. Public Service Commission*, 262 U. S. 679; *McCardle v. Indianapolis Water Co.*, 272 U. S. 400. Among them is the present cost of construction or reproduction. Thirty years ago, *Smyth v. Ames* announced (546):

" 'We hold, however, that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience.' "

"In *Southwestern Bell Telephone Co. v. Public Service Commission*, supra, (287) we said: 'It is impossible to ascertain what will amount to a fair return upon properties devoted to public service without giving consideration to the cost of labor, supplies, etc., at the time

the investigation is made. An honest and intelligent forecast of probable future values made upon a view of all the relevant circumstances, is essential. If the highly important element of present costs is wholly disregarded such a forecast becomes impossible. Estimates for tomorrow cannot ignore prices of today.' The doctrine above stated has been consistently adhered to by this court."

In the following cases the Supreme Court of the United States reversed the order of the fact-finding body as confiscatory because of the failure of the respective commissions to give due consideration to reproduction cost as an element in determining fair value: *Bluefield Co. v. P. S. C.*, 262 U. S. 679; *S. W. Bell Tel. Co. v. P. S. C.*, 262 U. S. 276 and *St. Louis and O'Fallon Ry. Co. v. United States*, supra.

The case of *R. R. Commission of California v. Pacific Gas & Electric Co.*, supra, [302 U. S. 388], does not change the rule so clearly established and followed up to the date of that decision, January 3, 1938. It was an appeal by the state commission from an order of a district court enjoining gas rates fixed by the commission. The commission, in arriving at a "rate base" considered only historical cost and as to reproduction cost said, (page 397): "The estimates of cost to reproduce are not at all convincing and cannot be of positive value in this proceeding." The Supreme Court of the United States held that since the commission received estimates of reproduction cost, the rejection by the commission of such evidence in arriving at a rate base which was reasonable, was not a denial of *procedural* due process.

The case was reversed and sent back to the district court to pass on the question of confiscation. That court in an opinion by WILBUR, J., (26 F. Supp. 507, February 9, 1939) considered the question of confiscation, and after making its own findings of fact, taking into account both the commission's report based on historical cost only, and the special master's report

based solely on reproduction cost new, concluded there had been no confiscation. In the course of the opinion it was said (p. 511): "The decisions of the Supreme Court are uniform to the effect that both these elements should be considered in arriving at the fair value of the property." Clearly, the Pacific Gas & Electric case, as considered by the Supreme Court, does not hold or suggest that *Smyth v. Ames* is no longer applicable to cases where the reviewing court is passing upon the question of confiscation.

The Supreme Court of Pennsylvania and this court have consistently followed the rule of *Smyth v. Ames* in the valuation of the property of public utilities. In *Erie City et al. v. P. S. C.*, 278 Pa. 512, 123 A. 471, Chief Justice KEPHART pointed out that "the value of private property used in public service and affected with a public interest is to be determined at the time of the inquiry or investigation regarding rates," and after citing the decisions of the Supreme Court of the United States, to which we have already referred, held that although original cost is to be considered in fixing the present value for rate-making purposes it cannot be used as a "substitute for value." See also the full discussion on the subject by this court in *Bangor Water Co. v. P. S. C.*, 82 Pa. Superior Ct. 48.

Reference is made in the briefs to the recent case of *Driscoll et al. v. Edison Light & Power Co.*, 307 U. S. 104, decided April 17, 1939, in which the Supreme Court of the United States sustained as constitutional an order of the present state commission prescribing temporary rates under Section 310 of Art. III of the statute of 1937, 66 PS sec. 1150. It is significant to note that, although the statute refers only to "original cost less accrued depreciation of the physical property," one of the grounds upon which the Supreme Court based its decision was that our state commission had in fact given consideration to all the relevant factors, including reproduction cost, in arriving at fair value as a

basis for temporary rates. In his opinion, Mr. Justice
REED, speaking for the court, said: "The commission,
however, did not confine itself to that one element
[original cost, less accrued depreciation] in setting the
fair value of the appellee's property, for the purpose of
temporary rates, at $5,250,000. It gave weight to re-
production cost, original cost, going concern value and
the necessity for working capital, and it allowed on this
rate base a return of more than six per cent." The
decision of the court in that case, in effect, constituted
a re-affirmation of the rule laid down in *Smyth v. Ames*,
169 U. S. 466, and upheld the order of the commission
because "the commission based the order now under re-
view on evidence requisite under that rule." This was
recognized and criticized by Mr. Justice FRANKFURTER
in his concurring opinion, p. 122.

It is equally significant that in the present case the
commission in fixing the temporary rates prescribed by
its interim order of October 5, 1937, expressly stated
(39a), that the "estimates of reproduction cost new,
less accrued depreciation," were set forth "to demon-
strate the basis of our determination of our tentative
calculation of the fair value of the property of respond-
ent for the purpose of this interim order."

One of the grounds upon which the commission at-
tempted to justify its refusal to give any consideration
to the estimates of reproduction cost in fixing the final
rates here in question was that they varied materially
from each other. It would be difficult to conceive of
a case in which there would not be material variations
in the estimates of the engineers for the respective
parties. In the Scranton-Spring Brook Water Com-
pany cases the estimates of the engineers for the com-
plainants and respondents respectively were over twenty
million dollars apart—see 105 Pa. Superior Ct. 203, pp.
212 & 213—and yet a fair and reasonable valuation was
eventually arrived at. The estimates in this case were
originally prepared, and subsequently trended, by the

express direction of the commission. It has at its disposal a large corps of engineers and accountants and it is one of its functions to investigate and test the accuracy of the appraisals of the engineers for the parties, the unit prices and labor costs used by each, and determine for itself a reasonable reproduction cost of the property.

In their discussion of the several appraisal estimates, counsel for the commission, after criticizing the Davis appraisal as already quoted, continued, "In making an inventory of the power house it does not appear that the contractor who made the estimate for Mr. Davis proceeded with sufficient thoroughness to ascertain the depth or width of the foundation, either of the structure or the engines. (R. 356a-358a). The testimony with regard to the classification of poles for the purpose of ascertaining depreciation is so theoretical and hypothetical as to be worthless. An extended quotation from that testimony and a discussion thereof is found in appellant's brief at pp. 185-216. As regards the amount of wire used in respondent's system, Mr. Davis and Mr. Johnson made frequent admissions of miscalculations and failure to make proper allowances, so that their estimates are open to serious question. (R. 1013a-1016a) ......

"On the subject of accrued depreciation, it appeared to the Commission that complainants' witnesses had relied mainly on installation dates and theoretical formulae to compute expired life, and had not carefully and scrupulously related their calculation to the actual condition of the property. An estimate of accrued depreciation having such a basic defect is untrustworthy and misleading and must be rejected: *Cheltenham & Abington Sewerage Company, v. Public Service Commission,* 122 Pa. Superior Ct. 252, 270 (1936); *Pennsylvania Power & Light Company v. Public Service Commission,* 128 Pa. Superior Ct. 195, 211 (1937)."

It is self-evident that no reliance can be placed on an appraisal estimate where the inventory on which it is based is incorrect or incomplete or vitally deficient; such defects are almost impossible of correction; but where differences appear in the valuations put on correct inventories, they can be adjusted and a fair and reasonable valuation be arrived at. The differences in the respondent's engineers' appraisal estimates, as pointed out by counsel for the commission were chiefly of this type—(1) ignorance or disregard of local labor costs; (2) accrued depreciation; and (3) percentages allowed for overheads, referred to under a later head. These were matters that could be corrected and scaled down by the commission and its engineering force, and were wholly different from the defects in the complainants' appraisal pointed out in the commission's brief. The incurable defects in the latter furnish no reason for wholly disregarding the estimates of the respondent's engineers, prepared as directed by the commission and based on an inventory not seriously questioned.

Furthermore, from the very helpful argument of Mr. Wilson, present counsel for the Borough of Brookville, it appeared that where the estimates of the respective engineers related to items as to which there was no real dispute, the variation between them was not greater than would ordinarily be expected—they were in comparative agreement as to many items.

We find no indication in our new Public Utility Law that the legislature by its enactment intended to authorize the commission, as its agent, to discard, when ascertaining and fixing the fair value of the property of a utility, any or all of the established elements of fair value. No matter what economic theories the commission may have evolved to its own entire satisfaction, or how firmly it may be convinced that its predecessors and all the courts have, in its own language (107a), failed "to perceive the problem" from the proper point of view, it is still the duty of the commission, and our

duty, to "apply the law of the land to facts developed of record," until that law has been changed in a constitutional manner.

By section 1005 of Art. X of the Statute of 1937, 66 PS sec. 1395, the commission is charged with the duty of making findings "in sufficient detail to enable the court on appeal to determine the controverted question presented by the proceeding, and whether the proper weight was given to the evidence."

The commission having given *no* weight to the evidence of reproduction cost, and having made no findings relative to that cost, it becomes our duty to reverse the final order (*S. W. Bell Tel. Co. v. P. U. C.*, supra; *St. Louis & O'Fallon Ry. Co. v. U. S. & I. C. C.*, supra) because it is based upon an error of law.

Thus far we have discussed the commission's report on the basis of its assumption that the total book cost of fixed capital as reflected on the books of the respondent on May 31, 1937, $197,516.70, represented the actual original cost thereof, from which, in arriving at the 'rate base', the commission deducted the amount invested in the generating plant, etc., as no longer used and useful. We are, however, of the opinion that the assumption is untenable and that the total book cost of fixed capital as reflected on the books of the respondent has not been sufficiently proved to be the original cost to justify its use as the rate base. It is admitted that no books were kept by the corporation from the date of its incorporation, January 20, 1897 to March 31, 1914, and from that date to 1925 we find that they were not kept in the manner directed by the Public Service Commission, and cannot be relied upon to show accurately the investment in the plant. In those cases in which we have discussed and upheld the use of original cost less depreciation as the measure of present value—see *Clark's Ferry Bridge Co. v. P. S. C.*, 108 Pa. Superior Ct. 49, 59-61, 165 A. 261; affirmed 291 U. S. 227; and the valuation of the Watres-

Gardner's Creek Line and Plymouth tunnel in *Scranton-Spring Brook Water Service Co. v. P. S. C.*, 119 Pa. Superior Ct. 117, 130, 181 A. 77; and similar cases— the cost could be determined accurately and beyond peradventure by the books of the company. That is not the case here. Entries made upon the books many years afterwards intended to bring them into relative approximation with the financial condition of the company cannot be used as an accurate determination of cost, such as will form the exclusive basis for fixing the present value of the plant. The evidence shows no declaration or distribution of *cash* dividends from January 20, 1897 until 1916, a period of nineteen years, when $2000 was paid. From 1916 to 1924, $3600 more was paid out in cash dividends; and from 1924 to 1927, $5250 was paid in cash dividends. We take no account of *stock* dividends, for they do not increase or diminish the cash investment in the plant.

The commission and the counsel for the complainants—appellants in No. 183 April Term, 1939—have apparently wholly overlooked the compounding effect of plowing back profits into the business. To take a supposititious case, if a corporation with $10,000 paid in capital is successful from the start, that is,—as complainants contend is the fact in this case—has no lag in business such as to justify a special allowance for going concern value, and makes an annual and continuous profit of 8% on the money invested, but pays out nothing in dividends, putting back all its earnings, as soon as realized, into the business, at the end of nine years its plant will have invested not $17,200 but $20,000; and at the end of eighteen years, it will have invested not $24,400, but $40,000. By plowing back its earnings at 8% per annum, the original investment doubles in nine years and quadruples in eighteen years. And at the end of eighteen years it cannot truly be said to have earned on its investment an annual profit of 16-2/3% ($30,000 divided by 18 = $1667: 16-2/3%

on $10,000) but only 8%, because all the earnings were put back into the plant and immediately formed part of the invested capital, which was earning 8% per annum.

It was this oversight which contributed in large degree to the extravagant figures presented by counsel for the complainants in their briefs and at the argument as to the rate of interest earned by respondent.

Following the example of the Supreme Court of the United States in *West v. C. & P. Telephone Co.*, 295 U. S. 662, where the state commission used a faulty and erroneous method of valuation, we might, without more, return the record to the commission to determine a rate base upon correct principles (p. 679); but both interested parties have asked us not to increase further this already swollen record and, if possible, to fix the fair value of the respondent's property, used and useful in the public service, using our own independent judgment upon a review of the evidence now in the record. We are unwilling to establish a course of action or precedent in this regard, but, we have done it in exceptional circumstances in the past—see, inter alia, *Beaver Valley Water Co. v. P. S. C.* 76 Pa. Superior Ct. 255, affirmed 271 Pa. 358, 114 A. 373; *Bangor Water Co. v. P. S. C.*, 82 Pa. Superior Ct. 48; and to a limited extent, *Scranton-Spring Brook Water Co. v. P. S. C.*, 119 Pa. Superior Ct. 117, 181 A. 77—and in the circumstances here present, will do it in this case.

The provisions of the Act of June 12, 1931, P. L. 530, amending section 22 of the Public Service Company Law of 1913, that in every appeal taken involving a question of the reasonableness of rates, whether taken by a complainant or by a public service company, it shall be the duty of the court to consider the entire record of the proceedings before the commission and on its own independent judgment to determine whether or not the findings made and the valuation and rates

fixed by the commission are reasonable and proper; and that if the court shall determine that the findings or the valuations are unreasonable it shall remit the case to the commission with directions to reform the findings, valuations, and rates in accordance with the court's opinion; were not re-enacted or included in the Public Utility Law of 1937. Hence the situation in these respects remains the same as it was before the approval of the Act of June 12, 1931, supra, and as laid down by the Supreme Court of the United States in *Ohio Valley Water Co. v. Ben Avon Boro.*, 253 U. S. 287, as construed by our Supreme Court in *Ben Avon Boro. v. Ohio Valley Water Co.*, 271 Pa. 346, 114 A. 369, and *P. S. C. v. Beaver Valley Water Co.*, 271 Pa. 358, 114 A. 373, and interpreted by this court in *Boro. of Lewistown v. P. S. C.*, 80 Pa. Superior Ct. 529, 533-534, where we held that the duty of this court to exercise its own independent judgment as to both law and facts was limited to cases where the utility claimed that confiscation of its property would result from the enforcement of the commission's order, as is the case here.

The average of the estimates of cost of reproducing the physical property, without considering the overhead expenses, of Dreyfus and Scharff, as adjusted upon the basis of 50% of the depreciated cost of the equipment in the power plant is $158,892. This we think is too high. The average of the estimates of Dreyfus, Scharff and Davis similarly adjusted is $138,261, which we are satisfied is too low. Our best independent judgment as to the reproduction cost depreciated, of the physical property, exclusive of overhead expenses and intangibles, is approximately $150,000. We are also of opinion that the working capital allowance, which includes supplies and materials on hand, made by the commission is too low. We are of opinion that a working capital allowance of $11,000 ($7000 for cash and $4000 for materials) should be made.

## OVERHEADS AND INTANGIBLES INVOLVED IN FIXING RATE BASE

We come then to the question of allowance for overhead expenses and intangibles in reproduction cost valuation. These items have been recognized by courts and commissions as definite elements of value and have been held to include omissions and contingencies, preliminary organization expense, the engineering and administrative expense of creating the plant, cost of financing, and going concern value. While these categories are not precisely separated and sometimes overlap, thus leading to confusion, they nevertheless form the best practical method of approach that has been suggested. Since the commission did not give any weight to reproduction cost it disregarded these elements. However, in its report it did discuss cost of financing and going concern value concluding that in no event was the respondent entitled to an allowance on account of these two items. This makes necessary some discussion of the subject by this court.

### OMISSIONS AND CONTINGENCIES

Dreyfus and Scharff, called by the respondent, allowed 3% on their valuations of physical property, that is $6000 and $5600, respectively, for omissions and contingencies, while Davis, the complainants' witness, grouped this item with engineering (fixed by the other engineers at 5%) and allowed 8% for both (6005a). So all the engineers are in practical agreement on this item. It has been generally recognized that when estimates are made of reproduction costs of a public utility or even the cost of an ordinary construction about to be made, there are bound to be omissions, and that situations will arise which are not apparent at the time or are liable to be overlooked. The courts and commissions generally have followed the business practice and made allowance on that account. Prudent contractors in bidding protect themselves by such allowances and we know of no reason why a different rule should be

applied here merely because it is a utility which is affected. We are of the opinion that these items must be considered, but that in arriving at a proper percentage the rate should be applied to the physical property alone. In other words, we see no reason for making an allowance on this account for mistakes in amount of working capital or any of the intangibles. We find 3% on the physical property to be a fair allowance for omissions and contingencies.

### PRELIMINARY ORGANIZATION EXPENSE

It is not open to argument that there is a period between the initiation of an undertaking to furnish public service and the time of completion of the plant ready to deliver service, when no revenues are forthcoming. Capital must be provided in advance and be unproductive for a period while taxes, interest and insurance are accumulating. A franchise and charter are usually essential and the securing of these entails legal and other expenses. The utility is entitled to capitalize such preliminary expense.

In *Ohio Utilities Co. v. P. U. C.*, 267 U. S. 359, 362, it was said: "Reproduction value, however, is not a matter of outlay, but of estimate, and should include a reasonable allowance for organization and other overhead charges that necessarily would be incurred in reproducing the utility. In estimating what reasonably would be required for such purposes, proof of actual expenditures orginally made, while it would be helpful, is not indispensable." That a sum should be allowed on this account we have never heard seriously questioned. Disputes frequently have arisen as to the amount of such allowance. Here the experts are practically agreed. While the sums that they named differed in amount, all agreed that 1.5% would be fair and the figures varied only on account of the valuation on which the percentage was calculated. We are of the opinion that an allowance of 1.5% should be made on this account.

PRELIMINARY ENGINEERING AND ADMINISTRATION
EXPENSES

That the commission deprived the utility of a reasonable return on the fair value of its property dedicated to a public use is demonstrated by its failure to take into account in fixing fair value the claim of the utility for an allowance for those engineering and administration expenses incurred before such property is ready for service. This was due to the commission's relying exclusively on cost, disclosed by such books as were available. Strictly speaking, the engineering and administration expenses incident to the construction of the physical part of a plant enter into the cost of the plant just the same as the amounts paid to bricklayers and carpenters or for materials. To refuse to take such an item into account is to ignore universally accepted business standards and experience. It would be more foolhardy to construct an electric light plant without plans, specifications and expert superintendence than to so erect a dwelling or office building.

In addition, an organization must be maintained to represent the stockholders during the period of construction, to provide for the payment of expenses and oversee construction on behalf of such stockholders. A staff must also be gathered together ready to function when the plant is completed. There was abundant testimony in the record from which it could only be concluded that there were here items contributing to the fair value of the property. To disallow all claims on this account amounted to confiscation. However, such expenses are not to be confused with those which are usually considered in the category of going concern value. Dreyfus allowed 12.55% as the aggregate of these items, divided, engineering 5.22%, administration 2.08%, legal 1%, interest, taxes, etc., during construction 3.25%. Scharff allowed 11% made up of engineering 5%, administration and legal 3%, interest and taxes during construction 3%. Davis allowed 9%

made up of engineering 5% (deducting 3% for omissions and contingencies from 8% for all three items), administration 1½%, interest, taxes, etc., during construction 2½%. We find that 10% is a fair aggregate allowance for these items combined.

### COST OF FINANCING

The respondent's witness, Dreyfus, allowed $11,280 under the head of cost of financing, and its witness, Scharff, $13,000. These figures were reached by allowing a percentage of all the capital required; Dreyfus adopted a rate of 5.11%, Scharff 6%. While complainant's witness, Davis, made no allowance, it appeared that his firm in the case of a utility of about the same size in an adjoining county, had suggested 5% as a fair return. The respondent financed its operations by the sale of common stock and borrowing. It borrowed $4750 from stockholders, $7000 from a bank and $74,-528.64 from affiliated companies, some of which loans were temporary and have been repaid. The company also funded a portion of its debt by issuing bonds in the sum of $35,000, which were taken by an affiliated company at par. The commission refused to allow anything on this account, assigning as a reason that there was no evidence that the company had paid any brokerage fees. As we are not in accord with the views of the commission as expressed in its opinion or the views of the complainants or respondent as stated in their briefs, it is necessary to consider this matter in some detail, believing that the experts made a mistake in their methods of approach and the commission in its legal conclusions.

We take it to be settled that when reproduction cost is considered as it must be in determining present fair value, some allowance should be made under the head of cost of financing. In *City of Erie v. P. S. C.*, 96 Pa. Superior Ct. 42, 51, we said: "When evidence of *original cost* is introduced as a factor in determining present fair value it is obviously quite proper to consider the actual experience of the company in the matter of the

cost of obtaining money and in such cases it has been consistently held that mere theoretical or hypothetical costs of this nature are not to be included. Cost of financing is however an element of value to be considered in a *reproduction cost* estimate. It is a definite item of cost and by the introduction of the testimony of witnesses familiar with the cost of issuing and marketing securities it should be possible to determine it with substantial accuracy." (Italics supplied) See also, *Ben Avon Boro v. Ohio Valley W. Co.,* 271 Pa. 346, 356, 114 A. 369, and *Chambersburg Gas Co. v. P. S. C.,* 116 Pa. Superior Ct. 196, 219, 176 A. 794.

The items of intangible values which may be included under the head of cost of financing comprehend brokerage fees and the mechanical costs of issuing the securities, such as cost of preparing, engraving, printing, registering and distributing bonds, costs of preparing and recording mortgages and other documents, trustees' and counsel fees and expenses connected with the issuing of securities so as to comply with the security laws enacted for the protection of the investing public. There may not be included the interest or discount paid to the purchaser of the security for the use of the money. A utility which devotes its property to a semi-public service undertakes to supply all the capital necessary for the efficient execution of the plan. It is compensated for this service by an allowance of a reasonable net return described in utility law as fair rate of return. It may not be compensated twice for the same service: *Cheltenham & Abington Sewerage Co. v. P. S. C.,* 122 Pa. Superior Ct. 252, 261, 186 A. 149.

The utility may supply all of the required capital without resort to borrowing or it may itself supply part of the capital and borrow the balance, sometimes hypothecating the property as security for the loan. In the latter case, the utility in effect guarantees the loan and takes the greater risk. The loan is usually made at a lower rate than the utility receives as an allowable

net return. The ratio of the amount of the loan to the value of the security, amount of bonds to total security, determines, within limits, the amount of the brokerage fee as well as the rate of interest paid for the loan.

It is apparent that this item of cost of financing has a direct relation to the allowable net return. In fixing fair value and rate of return experience has demonstrated that owing to the complexities of modern business resort must be had to tested methods before a safe and satisfactory answer can be obtained. The practice of financing public utility operations by borrowing in part has become so general and has come to have such a direct relation to fixing the rate which persons demand and should receive for furnishing capital that commissions and courts have found that by recognizing the actual transactions as they are carried out a more accurate and fairer solution can be obtained. For this reason, it has been the almost universal practice to give separate consideration to cost of financing. As we are concerned here with the question of confiscation, the final question is whether the utility has received due compensation for the use of its property. Intangible values allowed above bare physical value are frequently comprehended under different categories and we must take such fact into consideration before we can say that there is confiscation: *Los Angeles Gas Co. v. R. R. Comm.*, 289 U. S. 287, 313; *Dayton P. & L. Co. v. P. U. C.*, 292 U. S. 290; *Columbus G. & F. Co. v. P. U. C.*, 292 U. S. 398.

We cannot agree with the contention of the respondent that it is entitled to capitalize the expense of marketing the stock of the company. It would confuse rather than simplify the process of rate making to treat the expense of marketing the common stock of the utility as cost of financing. That subject may better be considered under a different head. The expenses incident to the issuing of common stock are naturally items to be properly treated under the heading of

preliminary or organization expense, while the marketing of the stock is a matter between the original subscriber for the stock of the company and any person to whom he may sell. We are of the opinion, therefore, as we have before indicated, that the cost of marketing the stock of the company is not a matter for capitalization as part of the rate base. The utility is compensated for the capital furnished by it in the fair return allowed.

The fact that the utility did not actually pay brokerage fees does not prevent the inclusion of a fair amount on this account: *Ben Avon Boro v. Ohio Valley W. Co.,* supra. We find that 3% is a fair allowance for this item. *Cf. Chambersburg Gas Co. v. P. S. C.,* 116 Pa. Superior Ct. 196, 201, 176 A. 794; *Scranton-Spring Brook W. S. Co. v. P. S. Comm.,* 119 Pa. Superior Ct. 117, 137, 181 A. 77.

### GOING CONCERN VALUE

We have heretofore had occasion to discuss going concern value in numerous cases wherein we have reviewed the federal and state authorities. We call particular attention to *Beaver Valley W. Co. v. P. S. Comm.,* 76 Pa. Superior Ct. 255, 269; *Chambersburg Gas Co. v. P. S. C.,* supra, p. 210; *Cheltenham & Abington S. Co. v. P. S. C.,* supra, p. 264; *Scranton-Spring Brook W. S. Co. v. P. S. C.,* 105 Pa. Superior Ct. 203, 220, 160 A. 230. We will not repeat in any detail what was there said but rather apply our former conclusions to the facts in this case.

It is implicit in the federal cases, as well as our own, that "there is a difference between even the cost of duplication, less depreciation, of the elements making up the plant and the commercial value of the business as a going concern"; that an assembled and established plant, doing business and capable of earning a fair return has a value in excess of the component parts considered separately at their cost; and that this element of value is a property right which should be considered

in determining the present value of the plant. On the other hand, the company by receiving a prompt and fair return on its investment may have been compensated in that form for this property right.

This element of value is readily recognizable in at least two forms. At times it is represented by the value that arises from the development of a force of trained employees skilled in performance of the service rendered by the utility. Again, it appears where the utility has made a prudent investment but there is a lag in fair return before the public has appreciated and taken advantage of the service offered and made a return therefor. The extent of this value is difficult to determine and cannot be defined with exact accuracy.

In this connection it is helpful to refer to certain conditions where losses or expenditures are not entitled to be capitalized for rate making purposes. It does not depend entirely upon deficits of operation for in some cases the investment may not have been prudent and to allow such value would be merely to capitalize past losses: *Hanover Boro v. Hanover Sewer Co.*, 251 Pa. 95, 100, 96 A. 132. The mere fact that the plant has been operated at a loss is not sufficient to permit such deficits to be added to the base on which the rate is reckoned: *Knoxville v. Knoxville Water Co.*, 212 U. S. 1, 14; *Galveston Elec. Co. v. Galveston*, 258 U. S. 388. Where there has not been a lag in earnings there is no reason why there should be any special allowance on this account for there has not been a loss.

The respondent's expert, Dreyfus, attempted to support a claim for $25,000 and its expert, Scharff, a claim for $18,000 for going concern value. The complainants' expert, Davis, allowed nothing on this account, but admitted that it was common practice to allow ten per cent of present value. The commission allowed nothing. The testimony of the company's engineers was based wholly on theoretical lag and was therefore insufficient to support its claim: *Scranton-Spring Brook W. S. Co.*

*v. P. S. C.,* supra, p. 139. A claim on this account, when allowed, must be supported by evidence of actual lag, not necessarily from the books of the company: *Cheltenham & Abington S. Co. v. P. S. C.,* supra, p. 266. The experts, in place of considering the history of the respondent, relied upon the fact that in many rate cases an allowance of ten per cent of present value was made. They failed to show that they had taken into account or considered the extent to which incoming revenues kept pace with investment. It was not shown that either the original installation or any extensions were made in advance of the demand for service, while there was some evidence that the public were asking for service in advance of the time at which it was supplied. The result is that the testimony is placed upon a purely theoretical basis and does not disclose either a sufficient history to determine whether any allowance should be made or that the experts considered such actual facts and took them into consideration in stating their conclusions.

The respondent in its brief falls into the same error for it relies largely upon the fact that in numerous cases the appellate courts have allowed a going concern value varying from 9.5% to 13.9%. While that fact is interesting, it lends little support to the claim made here, for the right to any allowance depends upon the facts shown in the particular case.

The evidence is equally unsatisfactory as to the existence of any special value in the organization of employees found here. The company purchases its power from another company and likewise purchases any trained service that it requires from affiliated companies. The commission might have concluded under the evidence that all of the service required to operate this company could have been procured in less than thirty days.

While the commission might have concluded that there was some slight evidence of going concern value,

certainly much less than that claimed by respondent, we cannot say that it was sufficient to warrant the conclusion that fair value could not be arrived at without special allowance on this account. The burden of proof was upon the respondent to show confiscation and incidentally that it was entitled to a special allowance for going concern value. This it failed to do. Our conclusion is, therefore, that we cannot say under the proofs as made that a sufficient and fair value could not be fixed for this company without a special allowance for going concern value.

As we have pointed out, while the respective engineers for respondent and complainants were wide apart on the allowances to be made in *dollars* for overhead and intangible costs entering into the reproduction cost new, they were not greatly apart as to the *percentages* on the items which they included as proper to be considered. The discrepancy was largely due to the base on which the percentages were to be calculated.

We have found that a fair percentage for all the overheads and intangibles, including cost of financing, would be 17½%.

While in making such calculations, it is usual to add the percentage to the physical cost new and then deduct the depreciation from the aggregate, it makes no practical difference if we add the percentage to the depreciated reproduction cost, bearing in mind that these overhead and intangible items are subject to the same *ratio* for accrued depreciation.

Hence we have as the reproduction cost, depreciated, the following:

Value of physical property depreciated .. $150,000
Add Intangibles and overheads, 17½% ..   26,250
                                        ─────────
Total reproduction cost, depreciated .... $176,250

Using our independent judgment, after considering the character of respondent's plant, the book cost of invested capital as shown on the company's books, the re-

production cost new and the accrued depreciation, and giving effect to the fact that the respondent's plant is a going concern, we find that the fair value of respondent's plant, used and useful for utility purposes, at the date of the final order in this case was $175,000. To this must be added $11,000 allowed for working capital and supplies and material; and we determine that $186,000 was the proper rate base on which a fair and reasonable return should be allowed the respondent.

## ANNUAL DEPRECIATION

A careful consideration of the commission's discussion of this subject has convinced us that the respondent will be deprived of a fair return even if the commission had applied its reasoning to a correct base. Our present purpose is, therefore, to point out the particular errors which have led to that result.

We agree with the conclusion of the commission and the expert witnesses that allowances for annual depreciation should be reasonably consistent with allowances for accrued depreciation. We also agree with the assumption of the commission that where the actual experience of a particular utility is available and the rates of that utility are being examined, such information is of great value.

The company presented its claim for annual depreciation principally through the testimony of the two experts, Dreyfus and Scharff, and the complainants in the testimony of the expert, Davis. Dreyfus fixed the amount at $6500, Scharff at $5109, and Davis at $4202, while the commission concluded that the company was only entitled to $2297. The commission disregarded the conclusions of the experts on both sides and refused to follow the methods adopted by those experts. They adopted a method of their own. The commission turned to the books of the company and discovered that for the period from January 1, 1920 to May 31, 1937, the company had annually set up as a reserve for depreciation from the earnings of the company sums which ag-

gregated in the end $78,422.38. It then found as a fact that that sum was a reasonable amount of depreciation for that period. It then showed by calculations that this would amount to an annual depreciation of $4,-369.34, and that if the 4% sinking fund method were adopted an annual allowance of $2297.16 would with interest at 4% produce the total of $78,422.38. It states that the percentage that will produce this sum, when applied to the fixed capital on the books of respondent at the close of each year or period from January 1, 1920 to May 31, 1937, is 3.03%. The commission conceded as a basis for its calculations and conclusions that the amount claimed by the company was proper.

In short, the commission accepted $4,369.34 as a reasonable amount for depreciation and then proceeded arbitrarily to reduce that amount to $2297 by multiplying and dividing, forgetting that it had found the larger sum represented the actual depreciation. The commission's whole calculation is based on the conclusion that the amount claimed by the company is a fair amount and that the amount so claimed on the books of the company is conclusive against it, but the company claimed $4369.34 and not $2297, and no theory for calculating depreciation can change that fact. Consequently, the commission's finding is left without any support whatever. In addition, it is out of all proportion, not only to the conclusion of the company's experts, but is only about one-half of that shown to be proper by the experts representing the parties who initiated this proceeding. Such a conclusion is arbitrary, unreasonable and without legal warrant.

We are also of the opinion that the commission in discussing the general subject of depreciation showed that it failed to give due consideration to the element of obsolescence as an item to be considered in arriving at a proper allowance. For further discussion of this subject we refer to what the expert, Scharff, said in his testimony. That obsolescence is an important item was

shown by the history of electric street railways and is made evident today by the rapid improvements that have been made in electric equipment resulting in the displacement of much machinery before it has served its normal life. In determining a proper amount to be allowed for depreciation, consideration must be given to the interests of the investing public as well as to the consumer. No business can be successfully operated for any reasonable length of time without making adequate allowance for depreciation. The claim for depreciation is never fanciful but is just as real as any other element with which we must deal in fixing rates.

Finally, even though the proper basic facts are found for fixing annual depreciation, the sinking fund method must be applied with discrimination as we pointed out in the Cheltenham & Abington case. We make special reference again to what was there said because it is applicable to the present situation. In our opinion, if the sinking fund method is adopted the increment by way of return in the form of interest should be calculated on the basis of the highest grade investments such as federal, state or municipal securities and it is clear that such investments cannot be secured at this time so as to yield 4% and have the funds available when needed. The commission in this connection said: "It follows, therefore, that respondent can invest 62 per cent of its depreciation funds in its own property on which it will receive a return of at least 6 per cent, and that only 38 per cent of the fund need be kept in marketable assets available for ready liquidation in order to meet current requirements. On this basis, if the funds necessarily invested in marketable assets earned only 1 per cent, the overall earnings of the fund would be in excess of 4 per cent. Therefore, the Commission in this case finds that an allowance for annual depreciation based upon the annuity required by a 4 per cent sinking fund will adequately provide for re-

turn of the investment at the end of its life." The fallacy in this argument is readily discovered. Interest returns vary in inverse proportion to the sufficiency of the security on which the loan is made. Assume that a 2% return can be secured on a state or federal bond, while 6% may be secured on some other less sound security. The lender demands the higher rate for the risk which he takes. When the sinking fund method is employed it assumes that no risk is to be incurred and on such a basis should the accumulations be calculated. If the company sees fit to invest the money in less desirable securities on account of receiving a greater gain, it assumes the risk and is entitled to the additional return. In short, the whole method of calculating depreciation on the sinking fund basis is predicated on the assumption of absolute safety. In our opinion a much fairer result will be obtained if the commission gives consideration to different methods of calculating depreciation before reaching a final result for there are advantages and disadvantages, as we have pointed out, in the employment of the sinking fund method.

The discussions of the experts require some further comment by us. As we understand the position of the expert, Davis, he excluded from the value of the physical property as a basis for calculating depreciation, the overhead items of administrative and engineering expenses incident to construction and allowance for omissions and contingencies. These items are just as much a part of the value of the physical plant as anything else that enters into its construction and such values disappear and are lost as the plant depreciates in value or becomes obsolescent.

Giving due weight to the methods of calculating depreciation adopted by the several engineers and the sinking fund method used by the commission, at a fairer rate of return than 4%, we find that $4500 is a fair and reasonable allowance for annual depreciation.

OPERATING EXPENSES, ETC.

We come then to expenses of operation, including managerial fees and the expenses of rate litigation.

The commission determined the allowable operating expenses of respondent for the seventeen month period from January 1, 1936 to May 31, 1937, and was of the opinion that such allowable expenses reflected the reasonable, average, and normal operating expenses of respondent. To the period so used we find no substantial objection.

The operating expenses of respondent, exclusive of taxes and provision for depreciation (and exclusive of rental of its general office at Brookville, in the amount of $1200 for 1936, and $500 for 1937), were $75,590.16 for the year 1936, and $28,049.16 for the five months ending May 31, 1937. The commission disallowed a total of $22,760.51 of the operating expenses incurred for the twelve months ending December 31, 1936, and $4586.41 of the operating expenses incurred for the five months ending May 31, 1937.[4] The commission allowed

---

[4]

| | 1936 | 5 Mos. Ended May 31, 1937 |
|---|---|---|
| Operating expenses as reflected on books of respondent exclusive of taxes and provision for depreciation and rental (p. 50) .............. | $75,590.16 | $28,049.16 |
| Adjustments: | | |
| Disallowed Expenses: | | |
| Generation by Gas Power .................... | 4,118.57 | 615.77 |
| Pool Expenses from Pennsylvania Elec. Co.: | | |
| Utility Clearing Corporation ................. | 1,503.10 | 491.42 |
| Utility Employees Securities Co. ............. | 309.63 | 213.38 |
| General Expenses: | | |
| Management Fees ............................ | 2,392.24 | 1,112.87 |
| Corporate Records and Secretarial Assistants .. | 371.82 | 121.77 |
| Utility Accountants and Tax Consultants ...... | 631.63 | 149.78 |
| E. J. Cheney ............................... | 43.00 | 9.75 |
| Overaccrual for Corporate and Advisory Exp. | ...... | 437.75 |
| Ford, Bacon and Davis ...................... | 1,099.63 | ...... |
| Utility Clearing Corporation ................. | ...... | 149.72 |
| Contributions and Donations .................. | 28.56 | 25.00 |
| Uncollectible Consumers Accounts .............. | 22.08 | 259.20 |
| Public Service Commission Expenses ........... | 12,240.25 | 1,000.00 |
| Total Disallowed Expenses .............. | $22,760.51 | $4,586.41 |

Additional Expenses Allowed:

$600 for rental of its general office at Brookville as a proper annual charge to operating expenses.

The total allowable operating expenses, as found by the commission, over the seventeen month period were $77,264.09, or $4544.94 per month, and on this basis the commission allowed yearly operating expenses of $54,-539.28 (190a).

The items of expense disallowed, and for which respondent now claims an allowance, may be classified as follows:

A. Charges made by affiliates (admitted) and others to respondent through the Pennsylvania Electric Company.

B. Direct charges made to respondent by affiliates (admitted or so found by commission), including management fees.

C. Other direct expenses of respondent.

It appears that all accounting work incident to keeping consumer and miscellaneous operating records was performed by the office force at Brookville, and that the general books of account of respondent were kept by the accounting department of Pennsylvania Electric Company at Johnstown. Included in the operating expenses on the books of respondent, as recorded by the accounting department and management of Pennsylvania Electric Company, were charges from admitted affiliate interests and others included in certain accounts which were pooled on the books of Pennsylvania Electric Company and apportioned in part to respondent. The charges to the pool account of Pennsylvania Electric Company consisted of (1) charges arising from Utility Clearing Corporation; (2) contributions to Utilities

| | | |
|---|---:|---:|
| Generation by Gas Power | 85.90 | 35.79 |
| Rent of Office at Brookville | 600.00 | 250.00 |
| Total Additional Expenses | $685.90 | $285.79 |
| Adjusted operating expenses exclusive of taxes and provision for depreciation | 53,515.55 | 23,748.54 |

Order Nisi of P. U. C. dated July 5, 1938—(189a, 190a).

Employees Securities Company; and (3) charges from other sources including Pennsylvania Electric Company itself. (119a, 120a, 144a).

Utility Clearing Corporation, Utilities Employees Securities Company, and Utility Management Corporation are admitted affiliates. The commission found that Utilities Accountants and Tax Consultants (Utility and Financial Accountants, Inc.), Corporate Records and Secretarial Assistants, and E. J. Cheney were affiliates of respondent. Such finding was based largely on the report of J. A. Wilhelm and Harry Osman, which was a report submitted to the Federal Power Commission. This report was received in evidence by the commission, over the objection of counsel for respondent. It contained facts showing affiliation between respondent and the non-admitted affiliates, and it was upon the facts contained in this report that the commission based its findings of affiliation. Both Wilhelm and Osman, the former an employee of the Pennsylvania Public Utility Commission, and the latter an employe of the Federal Power Commission, identified the report and explained its sources, and were available to counsel for respondent for cross-examination. The sources were the books of the various companies comprising the Associated Gas and Electric system. We think that the report was properly admissible. As stated in *Muskogee Gas & Electric Company v. State,* 81 Okla. 176, 186 P. 730, at page 733: "The witness is not giving the contents of the books as such. He is merely stating what he has found out and knows from his own knowledge. This the company has opportunity to rebut if it has in its possession the records and books from which the exhibits were compiled." Certainly the books of the Associated Gas and Electric companies were available to respondent in this case.

Neither the Public Service Company Law (Act of July 26, 1913, P. L. 1374, 66 PS Sec. 1 et seq.) nor the Public Utility Law (Act of May 28, 1937, P. L. 1053, 66

PS Sec. 1101 et seq.) contains any provisions relating to the kind of evidence which may be received and acted upon by the commission, and we do not think that the legislature contemplated that the strict rules of evidence should be rigidly applied to commission hearings. *Schuylkill Railway Co. v. P. S. C.*, 268 Pa. 430, 432, 112 A. 5. We do not conceive that respondent was deprived of any right by the admission of the report, or that such admission violated any applicable rule of law.[5] Respondent had ample opportunity to establish that the facts set forth in the report were incorrect and not taken from the proper books and records.

We conclude that the commission's finding with respect to affiliation between respondent and Utility Accountants and Tax Consultants (Utility and Financial Accountants, Inc.), Corporate Records and Secretarial Assistants, and E. J. Cheney, was supported by the evidence.[6]

------

[5] See Act of May 28, 1937, P. L. 1053, Art. XI, Sec. 1107, 66 PS Sec. 1437.

[6] "This conclusion is based upon the following facts: That respondent is directly controlled by Central U. S. Utilities Corporation which corporation is indirectly controlled by Associated Gas, & Electric Properties, a Massachusetts Trust, which is owned jointly by H. C. Hopson and J. I. Mange; that the interests, which control respondent, either directly or indirectly, also control Utility Accountants and Tax Consultants, Utility and Financial Advertising Agency, Daniel Starch and Staff, and E. J. Cheney; that such interests either singly or in conjunction with one or more other persons or corporations, are exercising full and unhindered influence and control over the policies, acts and actions of respondent; that such interests stand in such relationship to respondent that there is an absence of free and equal bargaining power between respondent and the persons and corporations herein held to be affiliates; that affiliation exists because of interlocking directors, officers and employees and by their acts and actions; that these persons and corporations are under the dominant control and management of the same persons and corporations who control respondent; and that the Associated Gas & Electric Company itself deems all such corporations and persons

Consequently, the burden was on respondent to show that such expenses paid to these affiliates were for services which were reasonable and proper, and that such amounts so paid were not in excess of the reasonable cost of furnishing such services. See Section 701 (a) and (c) of Act of May 28, 1937, P. L. 1053, 66 PS Sec. 1271.

By its orders dated June 8, June 15 and July 1, 1937, the commission required respondent to submit certain information which it deemed pertinent to a consideration of such items of operating expenses. The information which was sought by the commission was as follows: (a) copies of bills, (b) cost to billing company for alleged services and necessity therefor, (c) amounts charged to each account on books of respondent, together with complete underlying details, (d) proof that any specific service was rendered, and (e) analysis of pool accounts of Pennsylvania Electric Company and amounts- allocated therefrom to respondent together with the same information required under (a) to (d) inclusive. (141a).

The commission disallowed any payments made to these affiliated interests on the ground that there was no evidence in the record as to the value, necessity, or benefit of the services rendered by these affiliated companies to respondent (280a); but the commission in its brief recognizes that respondent did receive some necessary services from its affiliates and that the affiliates may be able to supply those services at a cost to respondent lower than if the services were secured elsewhere. In the commission's brief it is also stated: "If appellant will properly support the charges, the Commission will allow them." (p. 83).

Charges arising out of intercompany relationships be-

as affiliates because of the execution and operation of the life insurance contracts heretofore reviewed."

(Order Nisi of P. U. C. dated July 5, 1938, pp. 132a, 133a)

tween affiliated companies should be scrutinized with care (*Johnsonburg v. P. S. C.*, 98 Pa. Superior Ct. 284, 291; *Chambersburg Gas Co. et al. v. P. S. C.*, 116 Pa. Superior Ct. 196, 226, 176 A. 794); and if there is an absence of data and information from which the reasonableness and propriety of the services rendered and the reasonable cost of rendering such services by the servicing companies can be ascertained by the commission, allowance is properly refused (*New York State Electric & Gas Corporation et al. v. P. S. C. et al.*, 245 App. Div. 131, 281 N. Y. S. 384, 274 N. Y., 10 N. E. 2d 567, 275 N. Y. 534, 11 N. E. 2d 736; *Smith v. Illinois Bell Telephone Co.*, 282 U. S. 133).

The commission's appraisal of the evidence led it to conclude that many of the charges by the affiliated companies were for the direct or indirect benefit of holding and intermediate holding companies in the Associated Gas and Electric system. With this we concur. Moreover, the record in this case is an illustration of the fact that effective and satisfactory State regulation of utilities is made increasingly difficult by the progressive integration of utility services under holding company domination. (178a).

The desire of public utility management, evidenced by various methods, to secure the highest possible return to the ultimate owners is incompatible with the semipublic nature of the utility business, which the management directs. It therefore follows that the commission should scrutinize carefully charges by affiliates, as inflated charges to the operating company may be a means to improperly increase the allowable revenue and raise the cost to consumers of utility service as well as an unwarranted source of profit to the ultimate holding company.

A. The commission disallowed charges made by Utility Clearing Corporation and Utilities Employees Securities Company (admitted affiliates) to respondent through the Pennsylvania Electric Company. The Util-

ity Clearing Corporation, the commission found, acted in the capacity of a clearing house for the acceptance, payment, and apportionment of bills rendered to holding and intermediate holding companies in the Associated system by affiliated companies and others, and that bills thus rendered were charged to pool accounts on the books of the clearing corporation, and upon apportionment the pool accounts were credited and concurrent charges made to the Utility Management Corporation and various operating companies in the Associated system, including Pennsylvania Electric Company and respondent. (145a) During the year 1936 the amount thus apportioned or charged to the Pennsylvania Electric Company was $300,169.37, and for the five months ending May 31, 1937, $60,671.92. The Pennsylvania Electric Company allocated these total pool expenses to itself and other Associated system companies operating in the western part of Pennsylvania, and commonly called the "Western Pennsylvania group," based upon the relationship of the gross operating revenue of each company in the group to the total gross operating revenue of the companies in that group. The total expense thus found and applied to the total pool expense in arriving at the amount to be allocated to appellant was 0.50 per cent in 1936, and 0.81 per cent for the five months ending May 31, 1937. The cost of the services to the Utility Clearing Corporation does not appear, nor was the need for the service by respondent adequately established. Respondent failed to sustain the burden of proof, and the commission committed no error, nor did it act improperly, in excluding such payment as an operating expense. It is evident from the bills of the Utility Clearing Corporation that much of the service performed by this company was for the benefit of holding and intermediate holding companies in the Associated Gas and Electric system, although some service which was necessary and beneficial

may have been rendered to respondent and other operating companies.

The commission likewise properly disallowed respondent's apportioned contributions to Utilities Employees Securities Company, an admitted affiliate. The record does not show that these payments were for benefits received by respondent. (154a) The record shows that out of a total of $71,066.83 "charged to Injuries and Damages on the books of Pennsylvania Electric Company, $61,926.85 represented contributions made by Pennsylvania Electric Company to Utilities Employees Securities Company during the year 1936; and also that contributions were made to the same company in the amount of $26,346.43 during the five month period ended May 31, 1937, and charged to account '800. Employees Welfare Expense.'" (154a) These sums were also prorated in part to respondent. The commission found that the contributions were used to increase the stock equity of Associated Gas and Electric Company in Utilities Employees Securities Company, and that the contributions accrued entirely to the benefit of the former. (156a) After excluding charges from Utility Clearing Corporation and contributions to Utilities Employees Securities Company, the commission allowed the balance prorated to respondent from the pool accounts of Pennsylvania Electric Company, which was $891.25 for the year 1936, and $621.75 for the five month period ending May 31, 1937, representing, as the commission found, a fair and reasonable allowance for the services rendered and expenses incurred by Pennsylvania Electric Company on respondent's behalf. (157a, 158a)

B.    The commission disallowed charges made by Corporate Records and Secretarial Assistants, Utility Accountants and Tax Consultants, and E. J. Cheney, which were found by the commission to be affiliates of respondent. The commission disallowed these items as proper operating expenses because respondent "failed,

refused or neglected to furnish data showing (a) the cost to the original billing company of furnishing the service, (b) proof that specific service was rendered and the necessity therefor, and (c) contractual relationship and working arrangements with respondent." (171a) The commission was justified in disallowing these items on the evidence in the record.

The commission disallowed a charge of $149.72 made directly to respondent by Utility Clearing Corporation, an admitted affiliate. The evidence does not support the allowance of this charge as an operating expense; the charge does not appear to have been for the benefit of respondent.

Under the terms of a contract, Solar paid Utility Management Corporation 2½ per cent per year of its gross earnings for acting as its operating manager; the amount which respondent paid for 1936 was $2392.24, and for the five months ending May 31, 1937, $1112.87. The commission disallowed these payments as proper operating expenses. The commission stated that respondent did not obey the order of the commission, dated June 15, 1937, in which order the commission directed it to submit "data with respect to billings by The Utility Management Corporation, for the year 1936 and five months' period ending May 31, 1937, setting forth (a) cost to respondent as evidenced by billings for management fees, (b) cost to The Utility Management Corporation for furnishing management service to respondent together with full and complete underlying details, (c) the accounts charged on the books of respondent as the result of billings by The Utility Management Corporation, and (d) necessity for such service and proof of specific service having been rendered," (163a), and disallowed the management fees in their entirety as operating expenses of respondent, for the following reasons: (169a)—"(a) That respondent did not submit data to show the cost to the operating manager for specific management services allegedly furnished

or the necessity therefor as provided in the commission's order of June 15, 1937; (b) that respondent placed no data in the record to indicate what the cost to respondent for management service would have been if such service had been secured from a non-affiliated interest; (c) that the record indicates that the operating personnel at Brookville is adequate to meet the management problems of a company of this size; (d) that respondent has failed to sustain the burden of proof to show that management services were actually rendered or that any such services were reasonably necessary to the efficient operation of the property of respondent; and (e) that respondent has failed to show that the management contract is in the public interest or even that it is in the interest of respondent itself and that on the contrary, the record strongly indicates the contract to be detrimental to respondent and against public interest."

"Management fees charged against a public service company by the holding corporation in control by virtue of its stock ownership, [are] in a somewhat different position from ordinary operating expenses. The relation between the companies warrants the Commission in giving close scrutiny to and requiring adequate proof of the benefit or advantage accruing to the public service company, and in turn to the public, by the management contract, which the Commission found wholly lacking in this case": *Scranton-Spring Brook Water Service Co. et al. v. P. S. C.*, 119 Pa. Superior Ct. 117, at page 142, 181 A. 77, at page 87.

We find no compelling reason to object to the ruling of the commission, except as to (c), which, although the conclusion may be correct, lacks evidential support in the record; however, it does not affect the main contention.

C. The commission's disallowance of contributions by respondent in the amount of $28.56, and $25 for the year 1936 and the first five months of 1937, re-

spectively, must be sustained; the amounts involved are trivial. They are expenditures which are entirely optional and not compulsory, and it does not appear that any adverse effect on respondent's revenue would ensue if such contributions and donations were not made. *Denver Union Stock Yard Co. v. United States*, 304 U. S. 470, 482, 483. (176a)

Respondent included in operating expenses for 1936 and the five months ending May 31, 1937, the sums of $600 and $500, respectively, for uncollectible consumers accounts. The commission disallowed $259.20 for the five months of 1937 as being an excess amount to place in a reserve for such purpose, and found that the proper provision for uncollectible consumers accounts should be $577.92 for the year 1936, and $240.80 for the five months ending May 31, 1937. The commission's finding was based upon the actual experience of respondent during a sixty-five month period. On the basis of the respondent's experience, we are of the opinion that the commission's allowance for uncollectible consumers accounts is proper and adequate. *Chambersburg Gas Co. et al. v. P. S. C.*, supra, p. 225. (160a)

Respondent made provision for certain advisory and corporate expenses by creating an account entitled "Reserve for Advisory and Corporate Expenses," with concurrent charges to "Other General Expenses" for the five months ending May 31, 1937. This item of $437.75 represents the difference between the amount thus accrued for the five months period and the amount actually expended during that period. The commission disallowed this item in determining the normal operating expenses of respondent for the reason that there were no data of record to show that there were any legitimate anticipated expenses for which such an accrual should be provided. We find no error in the commission's action in this respect, as the overaccrual is not supported by respondent's experience or by any other facts in the record. (174a)

As an operating expense respondent included in "Generation by Gas Power" for the year 1936 and the five months ending May 31, 1937, the amounts of $4118.57 and $615.77, respectively. The commission found that respondent's gas engine generating plant was not used and useful in the public service, and excluded the gas engine, generators, and auxiliary equipment of said plant as being property not used or useful in the public service, in its determination of a rate base. We have previously stated that it is our conclusion that such equipment should be included at 50 per cent of its depreciated reproduction cost, as estimated by Messrs. Dreyfus and Scharff. Consequently, there should be an allowance for the related items of expense of operation of the plant, which were disallowed by the commission. See commission's brief, p. 93. The allowable expenses for the gas engine generation plant would be $4118.57 for the twelve month period ending December 31, 1936, and $615.77 for the five month period ending May 31, 1937. In view of our conclusions, the commission's allowance for the quantity of power generated by the gas engine generating plant for the year 1936 and the five months ending May 31, 1937, should be excluded.

The payment to Ford, Bacon and Davis in the amount of $1099.63 was disallowed by the commission as an operating expense because it represents rate case expense. This is an item that should be amortized over a reasonable period with the other rate case expenses, which we think were improperly disallowed by the commission. (174a)

The commission disallowed, under operating expenses, any amounts which were paid by appellant as charges for this rate case litigation, for the reasons that (1) respondent's action in this case has been arbitrary and unwarranted, and (2) that the rates charged by respondent have been excessive. (282a) The total charges and accruals for rate case expenses for 1936

and the five months ending May 31, 1937, were $12,-240.25 and $1000, respectively. The commission determined that $2589.52 in 1936 and $1000 for the five months ending May 31, 1937, represented expenses incurred in connection with investigations undertaken by the Public Service Commission and the Federal Power Commission with regard to contractual relationships and working arrangements between Pennsylvania operating companies in the Associated Gas and Electric system (including respondent) and their admitted and non-admitted affiliates, and that the balance of the charges in the year 1936 amounting to $9650.73 was incurred in connection with the rate proceeding under review. All of the expenditures were disallowed. (161a)

In addition to the proceedings referred to in the opening of this opinion, on January 6, 1936, at the instance of the Pennsylvania Public Service Commission, the Federal Power Commission, by its order in the matter of Metropolitan Edison Company et al., at Docket IT 5015, included respondent as one of the organizations whose affairs the commission intended to investigate. (6712a) The charges appearing on respondent's books for the expenses incurred in connection with this matter, which was instigated by the Public Service Commission of the Commonwealth of Pennsylvania, and which respondent was obliged to defend, are among the charges disallowed as operating expenses by the commission. The relationship of these expenditures to the rate case litigation was such that, if the latter expenses should be allowed, the former should be included therein. "Moreover, there is nothing in the record justifying an inference that the figures were erroneous or the payments improvident": *West Ohio Gas Co. v. Public Utilities Commission of Ohio*, 294 U. S. 63, 73.

The litigation to which respondent has been subjected did not result from any action taken by it whereby it sought through a new tariff to raise its rates,

which were then found to be excessive and unreasonable; but rather the expenses have resulted from charges incurred in self-defense. The inception of the rate case may have resulted from the proposed merger of respondent and Pennsylvania Electric Company (see *Borough of Brookville v. P. S. C. et al.,* 102 Pa. Superior Ct. 503, 157 A. 513, affirmed 307 Pa. 194, 160 A. 856), but the record before us clearly discloses the immediate presence, or the attachment soon thereafter, of objectives other than the establishment of just and reasonable rates. Certainly there is no justification for a rate case to be used for the purpose of "laying the ground work for [municipal] ownership," or "for the appointment of a receiver for [respondent]," or for laying "the foundation for the dissolution of the charter of [respondent]." Respondent's expenses did not arise out of an attempt to establish an excessive and unreasonable rate schedule, but were incurred in defense of a rate schedule under which it had legally been operating. In such circumstances there appears to be no sound reason why respondent should be subjected to the payment of reasonable litigation expenses, incurred in defense of rates which it was properly charging under commission supervision. The fact that an eventual reduction of its rates was ordered, would not militate against this conclusion. Since 1913 respondent "has been subject to supervision by a commission empowered to prohibit unreasonable rates, and the presumption is that any profits from its business were lawfully acquired"; *Newton v. Consolidated Gas Co. of New York,* 258 U. S. 165, 175. In *Driscoll et al. v. Edison Light and Power Company,* 307 U. S. 104, Mr. Justice Reed, speaking for the Supreme Court, said: "As the commission concluded that the prior rates of the company were obviously excessive, it allowed nothing for expense in defending them. Consequently there is no discussion of the reasonableness of the amount of the company's charge and we accept them as reasonable.

Even where the rates in effect are excessive, *on a proceeding by a commission to determine reasonableness,* we are of the view that the utility should be allowed its fair and proper expenses for presenting its side to the commission." (italics supplied)

In *Scranton-Spring Brook Water Service Co. et al. v. P. S. C.,* 119 Pa. Superior Ct. 117, 181 A. 77, respondent-appellant took the initiatory action by filing a tariff schedule raising its rates to an extent found by the commission to be excessive and unreasonable, and we held that there had been no reason why the litigation expense caused by its own unjust and unreasonable action should be saddled upon the public. That is not the situation before us in the instant case, where the litigation expenses incident to respondent's defense are the result of proceedings instituted by or through the commission to determine reasonableness. We are of the opinion that there should be an allowance for rate case expenses in the amount of $12,240.25 for 1936 and $1000 for the first five months of 1937, and that the same should be amortized over a period of six years, and that the sum of $1099.60 paid to Ford, Bacon and Davis during 1936, in connection with investigation and checks of valuations, be similarly amortized as a rate case expense; the total to be amortized would be $14,-339.88, which with interest at 6%, would require an annual allowance for six years of $2916.20.

Respondent pays $1200 per year, or $100 per month, for its general office at Brookville, and the same is used for collection and other general office purposes, while electrical appliances are also there on display. The commission disallowed in gross income deductions $600 of the rental item for 1936 and $250 for the five months ending May 31, 1937. The commission points out that respondent did not include this rental in operating expenses, but in gross income deductions. The reason given by the commission for the allowance of only $600 of this rental as a proper annual charge to operating

expenses was that only approximately 50 per cent of the available floor space in the building in question is used for general office purposes, and that therefore only 50 per cent of this annual rental should be permitted as a reduction from gross income of respondent. This was an actually incurred expense and reflected by the books of respondent. A rental item of the amount here involved is not unreasonable, and we think that the commission has arbitrarily concluded otherwise. As we view the record, the evidence does not support the commission's finding, and we think that the commission's apportionment of the rental to the amount of floor space which it considered actually utilized for collection and other general office purposes is purely arbitrary. Full allowance for the rental paid by respondent under the circumstances should be made. If there has been a violation of the law, as the commission's brief indicates, of section 912 of the Public Utility Law, 66 PS sec. 1352, that is a matter which is not here involved, (188a).

The duty upon the commission was to determine what the fair and reasonable expenses of operating respondent company would be (*Chambersburg Gas Co. et al. v. P. S. C.*, 116 Pa. Superior Ct. 196, 227, 176 A. 794), and in so determining modern business realities should not be ignored. The functioning of the modern corporation—especially the public utility—is complex, and recent state and federal legislation has added to that complexity. It is unnecessary to detail the accounting and reporting requirements with which every such corporation is confronted. It would be ignoring the obvious to conclude that this work can be done without a proper staff and without payment for the services required. The commission is manifestly cognizant of the situation as we have previously noted. Although we have sustained, for reasons given, most of the disallowances of operating expenses for the seven-

teen month period, nevertheless we are not unmindful
that adequate provision must be made for respondent's
corporate functioning and for its compliance with state
and federal demands for various types of information.
The commission has stated that, assuming a portion of
the expenses which have been disallowed are properly
allowable operating expenses, it is not possible from
the record to determine the amount thereof because
respondent has failed, neglected, and refused to comply
with the orders of the commission to make necessary
data available (178a). We take it that if, in the future,
such data is furnished the commission, it will increase
the annual operating expenses by adding such amount
as it finds properly allowable for managerial, engineer-
ing, legal and secretarial services performed for the
respondent as a *separate corporate unit;* for it must not
be overlooked that this court, in the case of *Brookville
v. P. S. C.* 102 Pa. Superior Ct. 503, affirmed in 307
Pa. 194, 160 A. 856, reversed the order of the commis-
sion approving the sale of all the property and fran-
chises of Solar to Pennsylvania Electric, and remitted
the record with directions that the rate case pending to
Complaint Docket No. 8126—the present case, as con-
solidated with Complaint Docket No. 11404—should be
disposed of and the fair value of Solar's property be
determined before the commission passed upon the ap-
plication for approval of the sale.

One of the main reasons for our ruling was that we
felt that the fair value of Solar's property should be
determined and the operating expenses and other items
which enter into the fixing of fair and reasonable rates
should be ascertained before a sale and merger should
be effected, as "it would be very much more difficult
and expensive to ascertain the salient facts from the
books of a company which has absorbed about 150
smaller systems" (p. 509).

Our ruling was, in large measure, ignored, for the

respondent has, to all practical intents and purposes, been operated by Pennsylvania Electric, and forms a link in the complicated Associated Gas and Electric system. Respondent has been assessed for managerial, consultant and other like charges and expenses that bore no reasonable relation to its own needs and requirements. We are not able, any more than the commission, to find from the evidence in the record what is the fair and reasonable amount properly chargeable to the respondent on these accounts. Until the management in actual charge of the respondent is willing to furnish the commission the full and complete data justifying the contracts entered into with its affiliates in the Associated system and the basis justifying the assessments made against it in this respect, it has only itself to blame if it must bear the consequences flowing from its nullification of our order and its inability or refusal to segregate the items of expense properly chargeable to respondent.

The changes which we have made in the commission's determination of allowable operating expenses are reflected in the following statement, [cf. footnote 4].

|  | 1936 | 5 Mos. Ended May 31, 1937 |
|---|---|---|
| Operating expenses as reflected on books of respondent exclusive of taxes and provision for depreciation | $75,590.16 | $28,049.16 |
| Adjustments: |  |  |
| Disallowed Expenses: |  |  |
| Pool Expenses from Pennsylvania Electric Co.: |  |  |
| Utility Clearing Corporation | 1,503.10 | 491.42 |
| Utility Employees Securities Co. | 309.63 | 213.38 |
| General Expenses: |  |  |
| Management Fees | 2,392.24 | 1,112.87 |
| Corporate Records and Secretarial Assistants | 371.82 | 121.77 |
| Utility Accountants and Tax Consultants | 631.63 | 149.78 |
| E. J. Cheney | 43.00 | 9.75 |
| Overaccrual for Corporate and Advisory Exp. | ...... | 437.75 |
| Utility Clearing Corporation | ...... | 149.72 |
| Contributions and Donations | 28.56 | 25.00 |
| Uncollectible Consumers Accounts | 22.08 | 259.20 |
| Total Disallowed Expenses | $5,302.06 | $2,970.64 |
|  | $70,288.10 | $25,078.52 |
| Additional Expenses Allowed: |  |  |
| Rent of office at Brookville | 1,200.00 | 500.00 |

| Adjusted operating expenses exclusive of taxes and provision for depreciation and rate case expense | $71,488.10 | $25,578.52 |
|---|---|---|
| Less rate case expense | 13,339.88 | 1,000.00 |
| | $58,148.22 | $24,578.52 |

Using the method of calculation adopted by the commission, we find a total of $82,726.74 allowable operating expenses for the seventeen month period, which is at the rate of $4,856.28 for one month, and $58,395.36 for twelve months or one year.

### RATE OF RETURN

We come then to the rate of return. The respondent complains that the six per cent rate of return allowed by the commission is inadequate and contrary to the evidence adduced relating thereto; that it was the result of a practice adopted by the commission, and followed herein, of prescribing a rate applicable to all utilities without reference to the circumstances involved in the particular case. We think this criticism is not supported by the record.

The respondent called two witnesses who testified respecting the rate of return. Mr. Knudsen expressed the opinion that eight per cent would be a fair rate for respondent and Mr. Phelps stated that in his judgment the minimum rate of return should be seven per cent. These witnesses had a very limited knowledge of the actual operations of this utility, the locality it serves, and other individual factors proper for consideration in determining a fair rate of return. Their testimony, at most, reflected only their views and was not binding on the commission. There was ample evidence of the amount of the investment, size and nature of the utility, risks, maintenance charges, and all other elements attending this company's origin, development, and operation, to give the commission sufficient information on which to base a proper rate of return.

We concede that no definite, fixed rule can be laid

down which is arbitrarily applicable to all utilities. The risks incurred by some utilities are much greater than others. The rate of return should therefore vary according to the circumstances of each case and be determined from the evidence adduced, like any other fact; *Pennsylvania P. & L. Co. v. P. S. C. et al.,* 128 Pa. Superior Ct. 195, 213, 193 A. 427. "What may be a fair return for one may be inadequate for another, depending upon circumstances, locality and risk"; *United Rwy. & Elec. Co. v. West,* 280 U. S. 234, 251, 252; *Scranton-Spring Brook W. S. Co. v. P. S. C.,* 119 Pa. Superior Ct. 117, 145, 181 A. 77.

The courts have held that the return should be reasonably sufficient to assure confidence in the financial soundness of the utility, and should be adequate, under efficient and economical management, to pay all expenses of operation, provide for depreciation, payment of interest and reasonable dividends, and for a reasonable amount to be applied to a surplus account, thus insuring the maintenance of credit and enabling it to raise money necessary for proper discharge of its public duties: *Bluefield Water Works & Improve. Co. v. P. S. C.,* 262 U. S. 679, 692; *United Rwy. & Elec. Co. v. West,* supra.

The rate allowed, while not generous, is not out of line with the rates approved by the appellate courts and cannot be said in this case to be confiscatory. In *Willcox v. Consolidated Gas Co.,* 212 U. S. 19, 48, 50, six per cent was held by the United States Supreme Court to be sufficient return for a company supplying gas to New York. The rate of return of six per cent, in the case of *Driscoll et al. v. Edison Light & Power Co.,* 307 U. S. 104, was held not to be confiscatory. See, also, *Scranton-Spring Brook W. S. Co. v. P. S. C.,* supra; *Pennsylvania P. & L. Co. v. P. S. C. et al.,* supra.

It will be noted, however, that the order of the commission is based on conditions existing at the date of

its entry. It cannot be applied as a determination of a fair and reasonable return in the past. The fact that the complainants in their prayer for relief asked for a reduction of respondent's rates so as to return not more than *seven* per cent upon the fair and reasonable value of its property, shows the change which has occurred in the matter of fair return since the institution of these proceedings and which is reflected in the commission's order, and affords ample justification for its refusal, in the present proceeding to make any order of refund or reparation, as contended for by complainants, as appellants in No. 183, even if it had authority to do so in a proceeding begun in 1929.

One other matter is to be considered. Six per cent is, in our opinion, a fair and reasonable return for an established electric light and power company, in present usual and ordinary circumstances, with its existence assured and operating under favorable conditions. If it is harassed by continual agitation and litigation affecting its corporate existence, its corporate structure and credit may be affected, and as a consequence it may be entitled to a return of seven, or even eight, per cent per annum.

### SCHEDULE OF RATES

#### (Assignment of error 135)

The respondent asserts that the commission was not warranted in ordering it to file a single schedule of block meter rates applicable to all classes of customers, except street lighting, as it invades the managerial authority vested in it and is contrary to the practice of light and power companies in fixing schedules of rates to be charged customers, based on long years of experience. It contends that such a schedule will tend to discourage the use of electrical appliances requiring a greater consumption of electric energy, is detrimental to the development and expansion of its business, and that it has the right to put into effect separate

schedules of rates applicable to domestic, commercial, and industrial uses, respectively. "A public service company, as any other company, has the right to manage its own affairs to the fullest extent consistent with the public interest and in so far as they do not act contrary to law": *Hostetter v. P. S. C.*, 110 Pa. Superior Ct. 212, 220, 168 A. 493. See also, *Coplay Cement Mfg. Co. v. P. S. C. et al.*, 271 Pa. 58, 62, 114 A. 649.

That separate schedules of rates applicable to domestic, commercial and industrial purposes respectively are not in violation of law, is clearly indicated by section 307 of the Public Utility Law of May 28, 1937, (P. L. 1053, 66 PS sec. 1147), which provides that a utility "may establish a sliding scale of rates or such other method for the automatic adjustment of the rate of the public utility as shall provide a just and reasonable return on the fair value of the property used and useful in the public service, to be determined upon such equitable or reasonable basis as shall provide such fair return."

A summary, submitted at the argument, of the gross operating revenues of the company since the single schedule under the temporary order of October 5, 1937 went into effect, shows that the consumption for domestic purposes has been increasing, but for commercial and industrial purposes it has been decreasing. The increase was due partly to increase in customers and also in the amount of the average consumption. It would seem that while the commission has authority to control the rates so that they are not unreasonable, a utility furnishing electricity should have the right, in the absence of any proof of unfairness, to establish different schedules of rates for electric service for domestic, commercial and industrial uses.

There is nothing in our ruling in the Pennsylvania Power & Light Co. case (128 Pa. Superior Ct. 195) which justifies the commission in limiting respondent

to a single schedule of block meter rates, rather than three separate schedules of block meter rates, one for domestic consumers, one for commercial consumers, and one for industrial consumers, in addition to the schedule for street lighting. We are in accord with the commission's endeavors to secure a simplification of schedules. To the foregoing extent this assignment is sustained.

### RECAPITULATION

Based upon the foregoing, we find and determine that the total annual revenues to which respondent is entitled is $83,514, summarized as follows:

| | |
|---|---:|
| Return—6% on $186,000 .............. | $11,160 |
| Operating expenses, exclusive of provision for annual depreciation and taxes ..... | 58,395 |
| Annual Depreciation ................. | 4,500 |
| Taxes .............................. | 6,543 |
| Rate case expenses, amortized (for 6 yrs.) | 2,916 |
| | $83,514 |

This is based on the assumption that the allowance for taxes by the commission is correct. If the amount actually paid is more or less than $6543, the total will be correspondingly affected. So will operating expenses, if respondent furnishes the commission full and satisfactory data as to the managerial, engineering, legal and secretarial expenses properly chargeable to respondent.

This amount, $83,514, is $15,066 less than the respondent's operating annual revenue of $98,580, during the seventeen month period above mentioned. It is $3766 less than the net revenue permitted by the order of October 5, 1937, but $10,979 more than the net revenue allowed by the final order appealed from.

Appeal No. 179—To the extent herein indicated the order of the commission is reversed, and it is ordered that within thirty days of the return of this record,

the respondent, Solar Electric Company, shall file, post and publish new tariffs, effective upon ten days' notice to the public, embodying rates for electric service designed to yield annual revenues not to exceed the sum of $83,514. Each party to pay the costs of printing its or his own brief; the cost of printing the record in No. 179, used in both appeals, to be divided equally between the respondent and the intervening appellees, each paying one-half.

APPEAL NO. 183

The discussion in No. 179, in effect, disposes of the questions raised in this appeal. No good purpose would be served by prolonging it further.

Appeal dismissed at the costs of appellants.